UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

JANE E. WOODCOCK,                    :
                                     :
            Plaintiff                :     No. 4:11-CV-00700
                                     :
      vs.                            :     (Judge Nealon)
                                     :
MICHAEL J. ASTRUE,                   :
COMMISSIONER OF SOCIAL               :
SECURITY,                            :          **FILED**
                                     :        **SCRANTON**
            Defendant                :

                        MEMORANDUM                SEP 1 7 2012

                                          PER _____
**BACKGROUND**                                DEPUTY CLERK

          The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Jane E. Woodcock's claim for social security

disability insurance benefits.

          Woodcock protectively filed[1] her application for

disability insurance benefits on November 1, 2007. Tr. 17, 59, 83-

91 and 106.[2]  The application was initially denied by the Bureau of

Disability Determination on April 1, 2008.[3] Tr. 17 and 60-64.  On

_____

1.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

2.  References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of her Answer on June 30,
2011.

3.  The Bureau of Disability Determination is an agency of the
state which initially evaluates applications for disability
insurance benefits on behalf of the Social Security
                                          (continued...)

June 4, 2008, Woodcock requested a hearing before an administrative
law judge. Tr. 17 and 65-66.  After about 13 months had elapsed a
hearing was held before an administrative law judge on July 7,
2009. Tr. 34-58.  On November 10, 2009, the administrative law
judge issued a decision denying Woodcock's application. Tr. 17-29.
On December 2, 2009, Woodcock filed a request for review with the
Appeals Council, and after about 15 months had passed, the Appeals
Council on March 4, 2011, concluded that there was no basis upon
which to grant Woodcock's request for review. Tr. 1-6.  Thus, the
administrative law judge's decision stood as the final decision of
the Commissioner.

Woodcock then filed a complaint in this court on April
13, 2011.  Supporting and opposing briefs were submitted and the
appeal[4] became ripe for disposition on November 29, 2011, when
Woodcock filed a reply brief.

Disability insurance benefits are paid to an individual
if that individual is disabled[5] and "insured," that is, the

---

3.   (...continued)
Administration.   Tr. 61.

4.   Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."   M.D.Pa. Local Rule 83.40.1.

5.   To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."   42 U.S.C. § 432(d)(1)(A).
(continued...)

individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Woodcock met the insured status requirements of the Social Security Act through December 31, 2007. Tr. 17, 19, 98 and 106. In order to establish entitlement to disability insurance benefits, Woodcock was required to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see <u>Matullo v. Bowen</u>, 926 F.2d 240, 244 (3d Cir. 1990).

Woodcock, who was born in the United States on July 31, 1954, graduated from high school and can read, write, speak and understand the English language and perform basic mathematical

---

5.   (...continued)
Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

functions. Tr. 59, 83-84, 106, 109, 116 and 121. Woodcock, during her elementary and secondary schooling attended regular education classes. Tr. 116. According to documents filed with the Social Security Administration, after graduating from high school, Woodcock attended college for "4 or more years" which was completed in approximately 1977 and then, in 1998, obtained a Six Sigma Black Belt certification.[6] Id.

Woodcock has an extensive work and earnings history. Tr. 53-53 and 99. Woodcock has past relevant work experience[7] as an accounting clerk, collection person, human resources consultant, insurance clerk, project/account manager, quality control person, quality manager for a phone company, and a senior consultant at a consulting firm. Tr. 53-53. A vocational expert described her past relevant work as semi-skilled to skilled, sedentary work.[8] Id.

---

6. Six Sigma is a business management strategy developed by Motorola in 1986 and adopted by Jack Welch at General Electric in 1995. See What is Six Sigma? http://www.ge.com/en/company/companyinfo/quality/whatis.htm (Last accessed September 4, 2012); Six Sigma, Businessballs.com, http://www.businessballs.com/sixsigma.htm. (Last accessed September 4, 2012).

7. Past relevant employment in the present case means work performed by German during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

8. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as
> (continued...)

The records of the Social Security Administration reveal that Woodcock had earnings in the years 1972, 1974 through 1976, 1978 through 2001, 2003 and 2006. Tr. 99.  Woodcock's annual earnings range from a low of $340.15 in 1972 to a high of $121,861.48 in 1998. Id.  Woodcock's total earnings during those years were $1,083,846.01. Id.  Also, the record reveals that in the

---

8.  (...continued)
one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work.*  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work.*  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work.*  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

years 2002, 2004 and 2005, Woodcock filed "Profit and Loss from Business" forms with the IRS. Tr. 95-97. Those forms reveal that Woodcock was providing "Business Services" and had no profits or losses during each of those years (her total gross income equaled her total expenses).[9] Id.

Woodcock claims that she became disabled on September 15, 2006, because of narcolepsy, cataplexy and sleep apnea.[10] Tr. 38-39 and 110. Woodcock stated in a document filed with the Social Security Administration that she has "an overwhelming desire to sleep even at work" and that she has "[s]udden loss of muscle control ranging from slight weakness to total collapse." Tr. 110. Woodcock alleged that these conditions first interfered with her ability to work on March 1, 2005, but that she only became unable

9. In 2002 Woodcock's total gross income was $48,603.00; in 2004 $27,182.00; and in 2005 $32,634.00. Tr. 95-97.

10. Narcolepsy is defined as "recurrent, uncontrollable, brief episodes of sleep, often associated with . . . cataplexy . . . ." Dorland's Illustrated Medical Dictionary, 1232 (32nd Ed. 2012). Cataplexy is defined as "a condition in which there are abrupt attacks of muscular weakness and hypotonia triggered by an emotional stimulus such as mirth, anger, fear, or surprise. It is often associated with narcolepsy." Id. at 303. Hypotonia is defined as "a condition of diminished tone of the skeletal muscles, so that they have diminished resistance to passive stretching and are flaccid; this usually means the nerve supply is compromised." Id. at 907. Narcolepsy is primarily diagnosed on the basis of the reported subjective symptoms of the patient although sleep laboratory tests (multiple sleep latency tests) can be helpful in objectively determining a patient's tendency to fall asleep during the day. See Narcolepsy Fact Sheet, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/narcolepsy/detail_narcolepsy.htm (Last accessed September 4, 2012). Cataplexy is also diagnosed primarily on the basis of the clinical interview with the patient. Id.

6

to work because of them on September 15, 2006. Id.  Woodcock
further claims that she does not, on an ongoing basis, have the
stamina to lift, squat, bend, stand, reach, walk, sit, kneel, talk,
hear and climb stairs. Tr. 123. Woodcock stated that she has
problems with her memory, understanding, following instructions,
concentrating and completing tasks. Id.  Woodcock has not worked
since September 15, 2006. Tr. 110.

Although Woodcock claims that she has been disabled and
unable to work since September 15, 2006, the record reveals that
Woodcock applied for and received unemployment compensation
benefits during the first, second and third quarters of 2007 in the
amounts of $1096.00, $3562.00 and $2466.00, respectively.[11] Tr.
100.

For the reasons set forth below, we will affirm the
decision of the Commissioner denying Woodcock's application for
disability insurance benefits.

**STANDARD OF REVIEW AND SEQUENTIAL EVALUATION PROCESS**

Under 42 U.S.C. § 405(g) and relevant case law, the
court is limited to reviewing the administrative record to
determine whether the decision of the Commissioner is supported by

---

11.  An individual can only collect unemployment compensation if
the individual is able and willing to accept work. 43 P.S.
§801(d)(1).  The fact that Woodcock collected unemployment
compensation after her alleged disability onset date of September
15, 2006, suggests that she represented when applying for such
benefits that she was able and willing to accept employment.

substantial evidence. Counsel for the parties are familiar with

the five-step sequential evaluation process that the Commissioner

utilizes and the substantial evidence standard of review.[12]

---

12.  Substantial evidence "does not mean a large or considerable
amount of evidence, but 'rather such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565
(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197,
229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d
198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360
(3d Cir. 1999).  Substantial evidence has been described as more
than a mere scintilla of evidence but less than a preponderance.
Brown, 845 F.2d at 1213.  In an adequately developed factual
record substantial evidence may be "something less than the weight
of the evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).
        Substantial evidence exists only "in relationship to
all the other evidence in the record," Cotter, 642 F.2d at 706,
and "must take into account whatever in the record fairly detracts
from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S.
474, 488 (1971).  A single piece of evidence is not substantial
evidence if the Commissioner ignores countervailing evidence or
fails to resolve a conflict created by the evidence.  Mason, 994
F.2d at 1064.  The Commissioner must indicate which evidence was
accepted, which evidence was rejected, and the reasons for
rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642
F.2d at 706-707.  Therefore, a court reviewing the decision of the
Commissioner must scrutinize the record as a whole.  Smith v.
Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v.
Califano, 606 F.2d 403, 407 (3d Cir. 1979).
        The Commissioner utilizes a five-step process in
evaluating disability insurance benefits claims.  See 20 C.F.R. §
404.1520; Poulos, 474 F.3d at 91-92.  This process requires the
Commissioner to consider, in sequence, whether a claimant (1) is
engaging in substantial gainful activity, (2) has an impairment
that is severe or a combination of impairments that is severe, (3)
has an impairment or combination of impairments that meets or
equals the requirements of a listed impairment, (4) has the
residual functional capacity to return to his or her past work and
(5) if not, whether he or she can perform other work in the
national economy. Id.

**MEDICAL RECORDS AND OTHER EVIDENCE**

Before we address the administrative law judge's decision and the arguments of counsel, we will briefly review some of Woodcock's activities and medical records.

The record reveals that Woodcock lives with and takes care of her mother who is in her 90s. Tr. 47-49 and 119. During the relevant time period, September 15, 2006 through December 31, 2007, Woodcock was driving regularly to doctor's appointments and other places, including to grocery stores for food and Walmart for supplies. Tr. 48 and 121. Woodcock was able to prepare meals, do dishes, do laundry, perform house cleaning and take the garbage out. Tr. 48-49 and 120.  Woodcock did not indicate that she had any problem dressing, bathing, caring for her hair, shaving, feeding herself, and using the toilet. Tr. 119.  She merely noted that "many days" she does not get dressed and just stays inside. Id. Woodcock stated that she engages in gardening although it "is much more haphazard" and "not organized." Tr. 122.  Woodcock admitted that she phones friends and does work on a computer on a weekly basis. Id.  In August, 2007, a treating neurologist made her give up her driver's license but she subsequently insisted on driving, and went to a second neurologist on December 5, 2007, who provided a statement that she had the ability to drive and, based on that statement, the Pennsylvania Department of Motor Vehicles reissued her driver's license. Tr. 121, 22-223, 302 and 304-307.

9

As stated above, Woodcock's alleged disability onset date is September 15, 2006 and her date last insured is December 31, 2007, therefore, we will primarily focus on medical treatment received during that time frame.

On December 6, 2006, Woodcock had an appointment with Mark A. Blakeslee, D.O., a neurologist. Tr. 249-251. Woodcock told Dr. Blakeslee that she had severe hypersomnolence[13] for the last three years. Tr. 249. Woodcock described several incidents where she fell asleep while driving. Id. One incident involved a state police officer pulling up behind her when she had dozed off while merging into traffic. Id. She told the state police officer that she was looking at a map and was lost and apparently the officer was satisfied with her explanation and let her go without the issuance of a traffic citation. Id. Woodcock told Dr. Blakeslee that she falls asleep many times during the day and has intermittent episodes of a feeling of generalized weakness. Id.

Dr. Blakeslee conducted a physical examination of Woodcock, the result of which was essentially normal, including normal strength in the upper and lower extremities, normal muscle bulk and tone, and normal reflexes, sensation and gait. Tr. 250. Dr. Blakeslee was "suspicious" that Woodcock suffered from narcolepsy and that her symptoms were "suggestive of mild

---

13. Hypersomnolence is defined as "hypersomnia." Dorland's Illustrated Medical Dictionary, 896 (32nd Ed. 2012). Hypersomnia is defined as "excessive sleeping or sleepiness, as in any group of sleep disorders with a variety of physical and psychogenic causes." Id.

10

cataplectic spells." Id.   Dr. Blakeslee referred Woodcock for an overnight polysomnogram and a next day multiple sleep latency test. Tr. 251. Dr. Blakeslee prescribed the medication Provigil but advised her to discontinue that medication 48 hours prior to the sleep studies. Tr. 251 and 415. He further advised Woodcock that she should not drive. Id.

The overnight polysomnogram was performed on December 20 and the multiple sleep latency test on December 21, 2006. Tr. 239-242.

Dr. Blakeslee had a follow-up appointment with Woodcock on January 11, 2007.  In the report of that appointment, Dr. Blakeslee stated, in pertinent part, as follows: "The overnight [polysomnogram] demonstrated evidence of a shortened sleep onset latency as well as shortened REM latency at approximately 69 minutes.[14]  She had frequent leg movements which did disturb the

---

14.   "There are five phases of sleep: stages 1,2,3,4 and REM (rapid eye movement). Usually when you are sleeping, you begin stage 1 and go through each stage until reaching REM sleep, and then you begin the cycle again.  Each complete sleep cycle takes from 90 to 110 minutes. . . Stage 1 sleep is light sleep. You experience a drifting in and out of sleep. . .  You may experience sudden jerky movements of your legs or other muscles. . . . Around 50 percent of your time is spent in stage 2 sleep. During this stage, eye movement stops and your brain waves . . . become slower. There will also be brief bursts of rapid brain activity called sleep spindles. Stage 3 is the first stage of deep sleep. The brain waves are a combination of slow waves, known as delta waves, combined with faster waves. During stage 3 sleep it can be very difficult to wake someone up.  If you are
(continued...)

quality of her sleep at a rate of 28 events per hour.  She had no

significant obstructive sleep apnea.  She then had a multiple sleep

latency test. Her multiple sleep latency test was severely

abnormal. Her mean sleep latency was 1.4 minutes. On two of the

naps she fell asleep in less than one minute. She also went into

REM sleep during two of the naps.  These features would be

pathognomonic of narcolepsy."[15]  Tr. 237.  Dr. Blakeslee's

---

14.  (...continued)
woken up during this stage, you may feel groggy and disoriented
for several minutes.  Stage 4 is the second stage of deep sleep .
. . If these stages are too short, sleep will not feel
satisfying. REM sleep is the stage in which dreaming occurs. When
you enter REM sleep, your breathing becomes fast, irregular and
shallow. Your eyes will move rapidly and your muscles become
immobile.  Heart rate and blood pressure increase . . . ."  Mark
Stibich, Ph.D., The Stages of Sleep, About.com, http://longevity.
about.com/od/sleep/a/sleep_stages.htm (Last accessed September 5,
2012). Sleep onset latency is the length of time it takes to go
from full wakefullness to sleep. The normal time is from 8 to 15
minutes.  REM latency is defined as the time span between the
start of sleeping and the start of REM sleep. The normal time is
100 minutes.

15.  "A Multiple Sleep Latency Test (MSLT) measures the
propensity to fall asleep during quiet situation.  It objectively
evaluates daytime sleepiness by measuring the time to sleep onset
during naps scheduled at equal intervals through the day under
standardized conditions.  The MSLT is a non-invasive, painless
procedure during which electrodes are placed to monitor the
brain, heart, muscles and eye activity as well as airflow and
blood oxygen levels during the various sleep stages. A MSLT test
is commonly used to confirm or rule out narcolepsy. Narcolepsy is
confirmed when the average sleep onset latency is less than 8
minutes and when the patient has at least two naps associated
with REM (dream) period." What Is A Multiple Sleep Latency Test?
Ohio Sleep Medicine Institute, http://sleepmedicine.com/content.
cfm?article=45 (Last accessed September 5, 2012).

impression was that Woodcock suffered from narcolepsy with spells of occasional mild cataplexy. Id. The medications Provigil and Mirapex were prescribed and Woodcock was advised not to drive. Id. A follow-up appointment was scheduled by Dr. Blakeslee in four weeks. Tr. 238.

At the follow-up appointment on February 8, 2007, Woodcock told Dr. Blakeslee that she had "improvement" of her symptoms when taking the Provigil. Tr. 236. Woodcock stated that she was able to stay awake better in the daytime and that she was not having "near the sleepiness or drowsiness." Id. Woodcock did report "occasional episodes of mild cataplexy." Id. The results of a physical examination were normal. Id. Dr. Blakeslee continued Woodcock on her current medications and added Imipramine. Id. He further scheduled a follow-up appointment in 2 months. Id.

At an appointment with Dr. Blakeslee on April 12, 2007, Woodcock reported that changes to her medication regimen (the addition of the Imipramine) exacerbated her symptoms. Tr. 235. Dr. Blakeslee readjusted Woodcock's prescriptions (i.e., discontinued the Imipramine) and, at a subsequent appointment on May 7, 2007, noted that he did "not consider [Woodcock's narcolepsy symptoms] a

major problem" and at an appointment on June 21, 2007, noted that Woodcock had a reduction in her cataplexy spells. Tr. 233-234.[16]

On July 18, 2007, Woodcock had a second overnight polysomnogram and on July 19, 2007, another multiple sleep latency test (MSLT). Tr. 224-227. The polysomnogram was abnormal. Id. It evidenced frequent leg movements, arousals and severely fragmented sleep. Id. It was noted that the sleep fragmentation "may contribute to her complaints of daytime hypersomnolence." Tr. 226. The MSLT was also abnormal and very similar to the one performed in December, 2006. Tr. 224. The records of this testing do not indicate that Woodcock discontinued the medication Provigil prior to the studies.

On August 2, 2007, Woodcock had a follow-up appointment with Dr. Blakeslee to review the result of the sleep studies. Tr.

---

16. The treatment note specifically states as follows: "At Jane's last visit I did have her discontinue her Imipramine. She thought that it had actually caused more sleep disturbance . . . She has now been off this for approximately 4 weeks. At the present time she does tell me she is awakening occasionally at night though it is very brief and takes her less than 10 to 15 minutes to fall back to sleep. She is taking her Provigil 200 mg. In the morning and 200 mg at noontime. She tells me that if she were to stop during the day and put her head down or close her eyes that she could fall asleep. I told her that was not unexpected with narcolepsy. However, I would not consider it a major problem at this point. I explained to her that the Provigil hopefully should keep her awake when she wants to be and needs to be awake. However, if she were to have a situation where she were to sit down and close her eyes or be in a situation that is very sleep conducive, it is unlikely to keep her awake." Tr. 234.

222-223. At that appointment, Woodcock told Dr. Blakeslee that her
symptoms were the same and that "[i]f she's out and physically
active in the daytime she does okay. However, if she sits down and
is inactive physically she . . . struggles to stay awake." Tr. 222.
Dr. Blakeslee noted that the MSLT "continued to objectify her
complaints of severe hypersomnolence." Id.  Dr. Blakeslee noted
that Woodcock had "trouble focusing and concentrating" and "goes
off on tangential descriptions of issues." Id.  His impression was
that Woodcock suffered from "severe narcolepsy with cataplexy" and
"periodic leg movement of sleep with sleep fragmentation."  Id.
Dr. Blakeslee discontinued the Provigil and started Woodcock on
Adderall XR and increased her dose of Mirapex. Woodcock informed
Dr. Blakeslee that she had been driving. Id.  Dr. Blakeslee
responded to that disclosure by telling Woodcock that he would be
notifying the Department of Motor Vehicles of her condition and she
would likely have driving restrictions for at least six months. Tr.
223.

In September, 2007, Woodcock contacted the office of her
primary care physician, Douglas A. Spotts, M.D., about her driving
situation. Tr 257 and 369.  There is notation in the record from
Dr. Spotts that it was "ok" for Woodcock to drive because her
"narcolepsy [was] stable." Tr. 369.

On October 3, 2007, Woodcock had an appointment with Dr.
Blakeslee at which Woodcock stated that she "noticed a fairly

15

dramatic improvement in her symptoms" and that "she's much more awake and alert from the time she takes the medicine at 8 in the morning until 5 PM." Id. Woodcock further stated that "[w]ith the addition of Adderall and continuing on her Effexor she . . . really had no significant episodes of cataplexy." Id. The results of a physical examination were essentially normal. Id. A mental status examination was also normal. Id. Woodcock was "much more focused and attentive." Id. Dr. Blakeslee's impression was that Woodcock suffered from "[s]evere narcolepsy with cataplexy, recently with measurable improvement on Adderall." Id.

On November 1, 2007, Woodcock again reported no recent episodes of cataplexy. Tr. 220. Dr. Blakeslee reported that Woodcock was frustrated with her condition, but believed that this was the result of a change in Woodcock's mood rather than an actual exacerbation of her narcolepsy symptoms. Id. This appears to be the last appointment that Woodcock had with Dr. Blakeslee because on December 5, 2007, Woodcock had an appointment with Stuart Hoffman, D.O., a neurologist at the Geisinger Medical Center, Danville, Pennsylvania. Tr. 304-307.

At the appointment with Dr. Hoffman on December 5th, Woodcock's "Chief Complaint" was as follows: "The patient is self-referred, requesting assistance to get her license back and a second opinion regarding narcolepsy with cataplexy." Tr. 304. Woodcock told Dr. Hoffman that "she has had chronic daytime

16

sleepiness for [the] past several years, likely due to insufficient sleep in part." Id. Dr. Hoffman noted that there was little evidence that Woodcock experienced cataplexy except on rare occasions and further noted that there was no evidence of falls, alterations in awareness, seizures, or episodes of syncope (fainting). Tr. 304-305. Dr. Hoffman reviewed Woodcock's sleep studies and noted that Woodcock told him that "she did not keep sleep logs for either of her two sleep studies or MSLTs and . . . that she did not receive any preparation." Tr. 305. The results of a physical examination were essentially normal. Tr. 305-306. Dr. Hoffman stated that Dr. Blakeslee's diagnosis of cataplectic episodes was "questionable" and that his diagnosis of narcolepsy based on Woodcock's two sleep studies may have been a "false positive." Id. Dr. Hoffman further stated that Woodcock "[c]urrently . . . is doing well on Adderall and Effexor. At this point, I am not entirely convinced that the patient has narcolepsy with or without cataplexy and this may all be due to insufficient sleep[.]" Tr. 306.

On December 18, 2007, Woodcock underwent a Maintenance of Wakefulness Test (MWT) ordered by Dr. Hoffman. Tr. 312-313. Prior to that testing, Woodcock denied any episodes to suggest cataplexy, sleep attacks or episodes of inappropriate sleepiness. Tr. 312. The results of the MWT were normal. Tr. 313.

17

On December 24, 2007, Woodcock had an MRI of the brain. Tr. 359. On December 26, 2007, Dr. Hoffman explained the result of that MRI as well as the MWT to Woodcock. Tr. 302. Dr. Hoffman told Woodcock the results were normal. Id. During that discussion Woodcock "denied any episodes of cataplexy, sleep attacks, or need for day time naps." Id. Woodcock reported "feeling very alert" and had "improved nocturnal sleep recently." Id.

On February 6, 2008, shortly after Woodcock's date last insured, Woodcock reported that she had "good control of her daytime sleepiness" and that she had "not had any cataplectic-like spells." Tr. 316. The results of a physical examination were essentially normal. Tr. 317. Dr. Hoffman indicated that Woodcock could resume driving. Id.

Well after the date last insured of December 31, 2007, Dr. Blakeslee and Dr. Hoffman both offered brief statements regarding Woodcock's condition. Tr. 328 and 330.

In a letter dated August 8, 2008, Dr. Blakeslee noted that he diagnosed Woodcock with narcolepsy with cataplexy and stated that Woodcock underwent treatment "without resolution of her hypersomnolence or spells of cataplexy."[17] Tr.328. He further indicated in a completely conclusory fashion that during the time

---

17. This statement that Woodcock did not have any resolution of her symptoms seems to be in conflict with Dr. Blakeslee's treatment notes of October 3 and November 1, 2007.

he treated Woodcock that she was "fully disabled."  Id.   Dr.
Blakeslee did not describe any specific functional limitations. Id.

In a letter dated September 4, 2008, addressed to
Woodcock, Dr. Hoffman, also in a conclusory fashion without any
description of Woodcock's functional limitations, stated in toto as
follows: "I understand that you are applying for disability related
to your diagnosis of narcolepsy with cataplexy. I support your
application given that your symptoms have been incompletely
controlled on medications so far.  However, if we are able to
adequately treat your symptoms in the future, I will also support
your return to work."  Tr. 330.

Dr. Hoffman completed a more specific functional report
on June 30, 2009, eighteen months after Woodcock's date last
insured.  Tr. 409-408.  Dr. Hoffman opined that Woodcock had
numerous non-exertional limitations, including restrictions in her
ability to perform simple tasks, maintain attention, work at a
consistent pace, and deal with normal work stresses. Tr. 411-413.
Dr. Hoffman also reported that Woodcock experienced cataplectic
attacks, sleep paralysis, excessive daytime sleepiness, and sleep
attacks, among other symptoms.  Tr. 409-410.  This more detailed
statement is, however, at odds with Dr. Hoffman's treatment notes
prior to and immediately after Woodcock's date last insured which
we reviewed above.

On March 31, 2008, state agency physician Mary Ryczak, M.D., examined Woodcock's medical records and concluded that Woodcock could engage in medium work. Tr. 290-293.[18]

## DISCUSSION

The administrative law judge, at step one of the sequential evaluation process, found that Woodcock had not engaged in substantial gainful work activity since September 15, 2006, the alleged disability onset date. Tr. 19.

At step two of the sequential evaluation process, the administrative law judge found that Woodcock had the following severe impairments: "narcolepsy with cataplexy and sleep apnea; and obesity." Id. The administrative law judge specifically noted that these impairments "in combination cause more than slight

---

18.   As will be explained infra, the administrative law judge did not give great weight to this opinion but gave Woodcock the benefit of the doubt and reduced her residual functional capacity to the sedentary level.  However, the opinion of Dr. Ryczak is supportive of the administrative law judge's decision because the regulation of the Social Security Administration provide as follows: "Medium work.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work." 20 C.F.R. § 404.1567(c).

limitations in the claimant's ability to perform basic work-related activities and are therefore, considered to be severe."[19]  Id.

At step three of the sequential evaluation process, the administrative law judge found that Woodcock's impairments did not individually or in combination meet or equal a listed impairment. Tr. 21-22.

At step four of the sequential evaluation process, the administrative law judge found that Woodcock had the residual functional capacity to perform sedentary work subject to several limitations including that the work had to be performed primarily in a seated position and she should not be exposed to unprotected heights or hazards. Tr. 22-23.

In setting this residual functional capacity, the administrative law judge reviewed the medical records and considered several other items including Woodcock's activities, the fact that she sought to have her driver's license reinstated, the conflict between the opinions of Dr. Blakeslee and Dr. Hoffman, and her vocational history. Tr. 23-28. The administrative law judge also considered the opinion of Dr. Ryczak although giving it "little weight."  Tr. 28.  The administrative law judge gave

_____

19.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual ability to work.  20 C.F.R. § 404.1521; Social Security Rulings 85-28, 96-3p and 96-4p.

Woodcock the benefit of the doubt and reduced Woodcock's residual functional capacity to the sedentary level.[20]

Based on the above residual functional capacity and the testimony of a vocational expert, the administrative law judge, at step four, found that Woodcock could perform all of her past relevant work which was described as semi-skilled to skilled, sedentary work by the vocational expert. The case was decided at step four and the administrative law judge did not proceed to step five.

The administrative record in this case is 507 pages in length, primarily consisting of medical and vocational records. The administrative law judge did an excellent job of reviewing Woodcock's medical history and vocational background in his decision.  Tr. 17-29.  Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 19, Brief of Defendant.  Woodcock argues that the administrative law judge erred by failing to

---

20.  A review of the medical records on or prior to the date last insured do not reveal any exertional impairments on the part of Woodcock. Repeatedly, Woodcock was found during physical examinations to have no musculoskeletal problems, full-motor strength, and a normal gait. Tr. 220-221, 234, 236-237, 250, 255-259 and 305-306. The only limitations that we can discern in the record that would impact Woodcock's work-related functionality would be the potential for her to repeatedly doze off on the job. Woodcock admitted that when she was active that she did not have a problem dozing off, It was only when she was in an environment where she was not active that she had a tendency to doze off.

properly evaluate the medical evidence and Woodcock's subjective complaints and erred by finding that Woodcock could perform her prior relevant work.  We have thoroughly reviewed the record in this case and find no merit in Woodcock's arguments.

Woodcock primarily focuses on the administrative law judge's rejection of the opinions of Dr. Blakeslee and Dr. Hoffman. The Court of Appeals for this circuit has set forth the standard for evaluating the opinion of a treating physician in <u>Morales v. Apfel</u>, 225 F.3d 310 (3d Cir. 2000).  The Court of Appeals stated in relevant part as follows:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." . . . The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled.  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.

<u>Id.</u> at 317-18 (internal citations omitted). The administrative law judge is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(d). In the present case, the administrative law judge in his decision specifically addressed the opinions of Dr. Blakeslee and Dr. Hoffman.  Tr. 27.

The social security regulations specify that the opinion of a treating physician may be accorded <u>controlling</u> weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Likewise, an administrative law judge is not obliged to accept the testimony of a claimant if it is not supported by the medical evidence. An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements. 20 C.F.R. § 404.1508 (2007). The administrative law judge appropriately considered the contrary medical opinion of Dr. Ryczak and the objective medical evidence and concluded that the opinions of Dr. Blakeslee and Dr. Hoffmann were not adequately supported by objective medical evidence consisting of signs, symptoms and laboratory findings. The administrative law judge gave an adequate explanation for rejecting the opinions of Dr. Blakeslee and Dr. Hoffman which post-dated Woodcock's date last insured by several months. Tr. 24-28.

As for Woodcock's argument that the administrative law judge did not properly consider her subjective complaints, the administrative law judge was not required to accept Woodcock's claims regarding her physical limitations, i.e., her inability to stay awake. <u>See</u> <u>Van Horn v. Schweiker</u>, 717 F.2d 871, 873 (3d Cir.

1983)(providing that credibility determinations as to a claimant's
testimony regarding the claimant's limitations are for the
administrative law judge to make).  It is well-established that "an
[administrative law judge's] findings based on the credibility of
the applicant are to be accorded great weight and deference,
particularly since [the administrative law judge] is charged with
the duty of observing a witness's demeanor . . . ."  <u>Walters v.
Commissioner of Social Sec.</u>, 127 F.3d 525, 531 (6th Cir. 1997); <u>see
also</u> <u>Casias v. Secretary of Health & Human Servs.</u>, 933 F.2d 799,
801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the
individual optimally positioned to observe and assess the witness
credibility.").  Because the administrative law judge observed and
heard Woodcock testify, the administrative law judge is the one
best suited to assess her credibility.

      Finally, Woodcock argues that the administrative law
judge erred in determining that she could perform her past relevant
work.  More specifically, she argues that the administrative law
judge did not accommodate her excessive daytime drowsiness.
However, as noted above, the administrative law judge did not have
to accept Woodcock's testimony as to the extent and magnitude of
the limitations resulting from her impairments.  We are unable to
discern any basis to set aside the administrative law judge's
finding that Woodcock had the residual functional capacity to
engage in a limited range of sedentary work and could perform all

25

of her past relevant work. The finding that Woodcock could perform all her past relevant work was based on the RFC assessment of sedentary work and the testimony of a vocational expert.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g), affirm the decision of the Commissioner.

An appropriate order will be entered.


_____
**United States District Judge**


Dated: September 10, 2012

of her past relevant work. The finding that Woodcock could perform all her past relevant work was based on the RFC assessment of sedentary work and the testimony of a vocational expert.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g), affirm the decision of the Commissioner.

An appropriate order will be entered.


**United States District Judge**


Dated: September 17, 2012